IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE ALLEN BOND, JR.,<br><br>                 Petitioner,<br><br>       vs.<br><br>FRED FOULK, Warden, High Desert State Prison,[1]<br><br>                 Respondent. | No. 2:12-cv-02747-JKS<br><br>MEMORANDUM DECISION |

Leslie Allen Bond, Jr., a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Bond is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at High Desert State Prison. Respondent has answered, and Bond has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On April 14, 2009, Bond was charged by information with murder and assault by means likely to produce great bodily injury. The information also alleged that Bond personally inflicted great bodily injury to the victim in the commission of the crime and that the injury caused the victim to become comatose due to brain injury or to suffer paralysis. *Id.* On direct appeal of his conviction, the Court of Appeal recounted the following facts underlying his conviction:

> A
> *The Prosecution's Case*
> [Bond] and his girlfriend (now wife) Tera Wike were attending a family barbeque at a trailer park where [Bond's] mother lived. The victim, Adam Sigler, lived in the trailer park with his family.

---

[1] Fred Foulk, Warden, High Desert State Prison, is substituted for Ron Barnes, former Warden, High Desert State Prison. FED. R. CIV. P. 25(c).

>[Bond] and Wike were having a good time at the barbeque, just "talking smack back and forth like [they] do." For a reason unknown to Wike, a person attending the barbeque named Michael Reese (Mike), commented to [Bond], "if he wanted to do whatever to women, to do it to him." Mike and [Bond] ended up in a fistfight, which was broken up by [Bond's] mother and sister.
>
>Wike decided to leave, and as she was doing so, she unintentionally bumped into [Bond] with her car. Upset, [Bond] punched Wike's windshield once, causing a hole in the windshield and damage to the car's quarter panel.
>
>After Wike left, [Bond] went into his mother's trailer and proclaimed "he was pissed" and was "'fucking killing people.'" He then finished a bottle of Southern Comfort and left her trailer to look for Mike, calling him derogatory names. [Bond's] mother had never seen her son so angry.
>
>[Bond] ran around the trailer park screaming he was going to "kick Mike's ass." [Bond] knocked on several residents' doors, asking for Mike and unsuccessfully challenged some residents to fight.
>
>[Bond] then came to Sigler's trailer, yelling, "'I know you got [Mike] hid in your house, I know you do.'" Sigler put his arms up with his palms facing out in a surrender position and said this was not Mike's house. [Bond] pushed past Sigler and attempted to punch him. The two began fistfighting in what "seemed like a normal fight." [Bond] then hit Sigler on his nose, causing Sigler to fall backwards in a "crumpling . . . way." Sigler was unconscious. [Bond] then jumped on top of Sigler, straddled Sigler's chest, and hit Sigler in the head repeatedly. With each hit, Sigler's "head was being bounced back and forth, kind of like a ping-pong ball." When [Bond] got off, Sigler's body contorted into an arch. Sigler then made a gurgling sound, coughed up a lot of blood, and then his body just lay flat. When [Bond] finished attacking Sigler, [Bond] proclaimed he had "just knocked that mother [fucker] out" and asked "'Who else wants some?'"
>
>Sigler, who was in a coma, was taken to two different emergency rooms before he was pronounced dead.

### B
*The Defense*

>Dr. John Wick and Dr. Albert Globus testified as defense expert witnesses. According to Dr. Wick, [Bond] had been diagnosed with attention deficient [sic] hyperactivity disorder (ADHD), dysthymia, which is a mind and chronic mood disorder, and polysubstance abuse. People with ADHD tended to be impulsive. Dr. Wick had not tested [Bond] for antisocial personality disorder and that disorder also was characterized by a person's poor impulse control. According to Dr. Globus, [Bond] had attention deficient [sic] disorder and organic brain syndrome from early in life.

A jury found Bond guilty of second degree murder and assault by means likely to produce great bodily injury and also found the great bodily injury with brain injury or paralysis allegation true. The court sentenced Bond to an indeterminate imprisonment term of 15 years to

2

life for the second degree murder conviction.  Pursuant to California Penal Code § 654, the court stayed any term for his conviction of assault by means likely to produce great bodily injury as well as the great bodily injury enhancement.

Through counsel, Bond appealed his conviction, arguing that: 1) his murder conviction must be reduced to involuntary manslaughter because the evidence that "Bond repeatedly punched the victim in the face with his fist in a single outburst of violence" failed to prove malice as required for second degree murder; and 2) the trial court committed reversible error by allowing the prosecutor to examine Bond's expert witnesses with "irrelevant and misleading questions that insinuated that [Bond] had antisocial personality disorder rather than serious mental impairments."  The Court of Appeal affirmed his conviction in a reasoned opinion. Counsel for Bond then petitioned the California Supreme Court for review of the appellate decision.  The petition was summarily denied on August 29, 2012.

Bond timely filed a Petition for a Writ of Habeas Corpus to this Court on November 2, 2012.

## II. GROUNDS/CLAIMS

In his *pro se* Petition, Bond raises the same claims he raised on direct appeal: 1) legally insufficient evidence supported his murder conviction; and 2) impermissible cross-examination of his expert witnesses.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

3

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

Bond has not replied to Respondent's answer. The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true." 28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952). Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

*Claim 1.  Insufficient Evidence to Support Murder Conviction*

Bond first argues that his murder conviction must be reduced to involuntary manslaughter because the evidence fails to prove the malice required for second degree murder.

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.  *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").

Under California law, "[s]econd degree murder is the unlawful killing of a human being with malice, but without the additional elements (i.e., willfulness, premeditation, and deliberation) that would support a conviction of first degree murder."  *People v. Sarun Chun*, 203 P.3d 425, 429 (Cal. 2009) (citations omitted).  Malice can either be express or implied. CAL. PENAL CODE § 188; *People v. Nieto Benitez*, 840 P.2d 969, 975 (Cal. 1992).  Malice is implied "when a person, knowing that his conduct endangers the life of another, nonetheless acts deliberately with conscious disregard for life."  *People v. Watson*, 637 P.2d 279, 283 (Cal. 1981) ("Implied malice contemplates a subjective awareness of a higher degree of risk than does gross negligence, and involves an element of wantonness which is absent in gross negligence.").

6

There are mental and physical components of implied malice. *People v. Cravens*, 267 P.3d 1113, 1118 (Cal. 2012). The physical component is "the performance of an act, the natural consequences of which are dangerous to life," and the mental component is "the requirement that the defendant knows that his conduct endangers the life of another and . . . acts with a conscious disregard for life." *Id.* (internal quotation marks and citation omitted). To prove implied malice, it is not necessary to establish that the defendant intended that his act would result in the death of a human being. *People v. Swain*, 909 P.2d 994, 998 (Cal. 1996). Rather, when it is shown the defendant intentionally performed an act, the natural consequences of which are dangerous to human life, the requisite mental state of malice is implied. *Id.* at 998-99. Implied malice may be proved by circumstantial evidence. *People v. James*, 74 Cal. Rptr. 2d 7, 28 (Cal. Ct. App. 1998); *see also People v. Lines*, 531 P.2d 793, 796 (Cal. 1975) ("It is settled that the necessary element of malice may be inferred from the circumstances of the homicide.").

Here, the court found that the evidence supported both the mental and physical components of implied malice:

> The nature of the beating [Bond] inflicted on Sigler was such that the natural consequence was dangerous to life. Sigler's initial stance was a surrender pose. Still, [Bond] hit Sigler on his nose with such force that Sigler fell backwards in a "crumpling . . . way." This led to Sigler losing consciousness. Thus, the force of [Bond]'s one punch was enough to knock out Sigler. But [Bond] did not stop there. [Bond] then straddled the unconscious Sigler and hit Sigler in the head repeatedly. With each blow, Sigler's "head was being bounced back and forth, kind of like a ping-pong ball." Boiled down to its essence, then, [Bond] pummeled to death a surrendering Sigler with multiple blows to his head after just one of those blows had caused Sigler to lose consciousness. Predictably, Sigler died from this attack. The physical component of implied malice was satisfied.
> . . .
> Here, [Bond]'s behavior before the attack, during the attack, and after the attack showed he was aware his conduct endangered life. Before the attack, [Bond] was aware of the destruction that just one blow of his fist could inflict. He had just punched Wike's windshield, causing a hole and damage to the car's quarter panel. He then proclaimed he

>was "'fucking killing people'" and targeted Sigler.  During his attack on Sigler, [Bond] quickly learned just one of his punches could knock Sigler to the ground and render him unconscious.  Despite that knowledge, he used that same type force to repeatedly pummel an unconscious Sigler to his death.  After the attack, [Bond] proclaimed his awareness of what he had done when he said, "I just knocked that mother [fucker] out."  These facts demonstrate [Bond] was aware that beating Sigler with his fists in the manner he did would endanger Sigler's life and he acted anyway.  The mental component of implied malice was satisfied as well.

Bond challenges the court's finding of implied malice because, according to Bond, "[t]he defense evidence showed that [he] was most likely mentally impaired by organic brain syndrome, attention deficit disorder, and possibly bipolar disorder, which resulted in [his] failure to control his violent impulse."  But Bond misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  Under *Jackson*, the role of this Court is to simply determine whether there is any evidence, if accepted as credible by the jury, sufficient to sustain conviction.  *See Schlup v. Delo*, 513 U.S. 298, 330 (1995).  In this case, the appellate court determined that there was sufficient evidence of implied malice as defined in California law to support Bond's second degree murder conviction.  Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Bond bears the burden of establishing by clear and convincing evidence that these factual findings were erroneous.  28 U.S.C. § 2254(e)(1).  Bond has failed to carry such burden.  The record does not compel the conclusion that no rational trier of fact could have found proof of the requisite implied malice  especially considering the double deference owed under *Jackson* and AEDPA.  Bond is therefore not entitled to relief on his legal insufficiency claim.

*Claim 2.  Impermissible Cross-Examination of Expert Witnesses*

Bond next argues that "[t]he trial court committed reversible error when it permitted the prosecutor to cross-examine [Bond's] expert witnesses with irrelevant and misleading questions that insinuated [he] had antisocial personality."  He appears to complain that the insinuation undercut his defense that it was mental impairments, rather than a mere antisocial personality, that rendered him unable to control his violent impulses.

As an initial matter, to the extent that Bond argues here—as he did on direct appeal—that the trial court abused its discretion in allowing the challenged cross-examination, such claim is not cognizable on federal habeas review.  Although the Ninth Circuit has suggested that an abuse of discretion may also amount to a constitutional violation, *see Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc), the Supreme Court has never held that abuse of discretion is an appropriate basis for granting federal habeas relief.[2]  Indeed, quite to the contrary, the Supreme Court has strongly suggested that, while abuse of discretion is an appropriate standard on direct review, in a federal habeas proceeding it is not.  *Renico v. Lett*, 559 U.S. 766, 772-73 (2010) ("It is not even whether it was an abuse of discretion for her to have done so–the applicable standard on direct review.  The question under AEDPA is instead whether the determination of the Michigan Supreme Court that there was no abuse of discretion was "an unreasonable application of . . . clearly established Federal law." (quoting § 2254(d)(1))).

---

[2]  At one time, the Ninth Circuit viewed a state court ruling to be "objectively unreasonable" if it amounted to a clear error.  *Van Tran v. Lindsey*, 212 F.3d 1143, 1152-54 (9th Cir. 2000).  This is the test the Ninth Circuit uses in reviewing a trial court decision under the abuse of discretion standard.  *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc).  The Supreme Court noted *Van Tran's* statement of the test and expressly rejected it as inappropriate under the AEDPA.  *Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (clear error standard is insufficiently deferential to state courts).

Moreover, any claim that his due process rights were violated as a result of the allegedly irrelevant cross-examination is without merit. Under California Evidence Code § 721, an expert witness may be cross-examined as to "the subject to which his or her expert testimony relates," and "the matter upon which his or her opinion is based and the reasons for his or her opinion." "[A] party seeking to attack the credibility of an expert may bring to the attention of the jury material relevant to the issue on which the expert has offered an opinion on which the expert was unaware or which he did not consider. The purpose and permissible scope of impeachment of an expert is to call into question the truthfulness of the witness's testimony." *People v. Bell*, 778 P.2d 129, 145 (Cal. 1989). As the Court of Appeal determined, the cross-examination of Bond's expert was appropriate under these guidelines:

> Dr. Wick testified on direct examination that [Bond] had been diagnosed with ADHD, and people with ADHD tended to be impulsive. On cross-examination, the prosecutor attempted to show that Dr. Wick had not taken into account the alternative diagnosis of antisocial personality disorder. The prosecutor elicited that Dr. Wick had not tested [Bond] for that disorder and that disorder also was characterized by a person's poor impulse control. This line of questioning was not an abuse of discretion because it was designed to elicit and did in fact elicit relevant testimony, namely, that the defense expert had not considered evidence that might have been relevant to the issues on which he was offering his expert opinion, namely, why [Bond] acted as he did.

Furthermore, even if the trial court had erred in allowing the challenged cross-examination, Bond still would not be entitled to relief on this claim. Improper questioning of a witness by the prosecutor is not alone sufficient to warrant reversal. Rather, the relevant inquiry on federal habeas review is whether the prosecutor's behavior so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Ortiz v. Stewart*, 149 F.3d 923, 934 (9th Cir. 1998). The record in this case does not indicate that Bond's trial was fundamentally unfair. Accordingly, Bond cannot prevail on this claim either.

V. CONCLUSION AND ORDER

Bond is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability. *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)). Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals. *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: April 10, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge

11